# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WALTER SNYDER,

            Plaintiff

    v.

CAROLYN W. COLVIN,
Commissioner of the Social Security
Administration

          Defendant

CIVIL ACTION NO. 4:15-CV-01510

(MEHALCHICK, M.J.)

## MEMORANDUM OPINION

This is an action brought under Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Walter Snyder's claims for disability insurance benefits and supplemental security income under the Social Security Act. This matter has been referred to the undersigned United States Magistrate Judge on consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. 20; Doc. 21). For the reasons expressed herein, the Commissioner's decision shall be **VACATED**, and Mr. Snyder's request for a new hearing shall be **GRANTED**.

## I.    BACKGROUND & PROCEDURAL HISTORY

On June 20, 2012, Mr. Snyder protectively filed applications for benefits under Titles II and XVI of the Social Security Act. Mr. Snyder alleges that be became disabled on June 20, 2011, when he was twenty-eight years old, due to the following impairments: anxiety, depression, Bipolar II Disorder, migraines, and back problems. (Admin. Tr. 307; Doc. 9-6 p.

16).  In November 2012, Mr. Snyder reported that, while his claim was pending his symptoms had gotten worse and that he suffered from additional limitations including decreased grip strength, and greater difficulty moving and walking.  (Admin. Tr. 344; Doc. 9-6 p. 53).

On October 25, 2012, Mr. Snyder's claims were denied at the initial level of administrative review.  During the initial evaluation of Mr. Snyder's claims, it was determined that the available evidence established the existence of the following medically determinable severe impairments: spine disorders, migraine, obesity, affective disorders, and anxiety disorders.  (Admin. Tr. 113; Doc. 9-3 p. 30).  His claim was denied after an adjudicator determined that Mr. Snyder was capable of engaging in other work at a sedentary exertional level.  (Admin. Tr. 120; Doc. 9-3 p. 37)(denying Mr. Snyder's Title II claim); (Admin. Tr. 133; Doc. 9-3 p. 50)(denying Mr. Snyder's Title XVI claim); *see* 20 C.F.R. §404.1567(a)(defining sedentary work in Title II claims); 20 C.F.R. §416.967(a)(defining sedentary work in Title XVI claims).  Mr. Snyder appealed this denial.

On March 25, 2014, Mr. Snyder appeared and testified during an administrative hearing before Administrative Law Judge Reana K. Sweeney ("ALJ").  Mr. Snyder was represented by counsel throughout the proceedings.  Impartial vocational expert James H. Earhart ("VE Earhart") also appeared and testified.

On April 24, 2014, the ALJ denied Mr. Snyder's claims in a written decision after concluding that Mr. Snyder was capable of engaging in a limited range of light work that would not preclude him from engaging in other work.  (Admin. Tr. 13-21; Doc. 9-2 pp. 14-22); *see* 20 C.F.R. §404.1567(b)(defining light work in Title II claims); 20 C.F.R. §416.967(b)(defining light work in Title XVI claims).  Mr. Snyder requested further administrative review.

On June 4, 2015, the Appeals Council of the Office of Disability Adjudication and Review denied Mr. Snyder's request for review.  (Admin. Tr. 1-5; Doc. 9-2 pp. 2-6).  This makes the ALJ's April 2014 decision the final decision of the Commissioner subject to judicial review by this Court.

On August 2, 2015, Mr. Snyder initiated the instant matter by filing a timely complaint in federal court.  (Doc. 1).  In his complaint, Mr. Snyder alleges that the ALJ's decision was not made in accordance with the law and regulations, and is based on findings of fact that are not supported by substantial evidence.  As relief he requests that this Court reverse the Commissioner's decision and enter an order awarding benefits, or in the alternative, remand this case to the Commissioner for a new administrative hearing.

On January 27, 2016, the Commissioner filed her answer.  (Doc. 8).  The Commissioner maintains that the ALJ's decision is correct and in accordance with the law and regulations, and that the ALJ's findings of fact are supported by substantial evidence.  Together with her answer, the Commissioner filed a certified transcript of the administrative proceedings in this case.  (Doc. 9, *et seq.*).

This matter has been fully briefed by the parties and is ripe for decision.  (Doc. 13; Doc. 15; Doc. 16).

## II.   STANDARD OF REVIEW

To receive benefits under Title II or Title XVI of the Social Security Act, the claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A).  To satisfy this requirement, the

claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant number in the national economy.  42 U.S.C. §423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).  In addition, to be eligible to receive benefits under Title II of the Social Security Act, a claimant must be insured for disability insurance benefits.  42 U.S.C. §423(a); 20 C.F.R. §404.131.

In evaluating the question of whether a claimant is under a disability as it is defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process.  20 C.F.R. §404.1520(a); 20 C.F.R. §416.920(a).  Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments"); (4) whether the claimant is able to do his past relevant work, considering his current residual functional capacity ("RFC");[1] and, (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his current RFC, age, education, and work experience.  20 C.F.R. §404.1520(a); 20 C.F.R. §416.920(a).  The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him from doing his past relevant work.  20 C.F.R. § 404.1512(a); 20 C.F.R. § 416.912(a).  Once the claimant has established at step four that he cannot do past relevant work,

---

[1] A claimant's RFC is the most a claimant can still do despite his limitations.  20 C.F.R. § 404.1545(a)(1); 20 C.F.R. § 416.945(a)(1);  see also Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).  Before the ALJ goes from step three to step four, he or she assesses the claimant's RFC.  20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4).  The RFC is used at step four and step five to evaluate the claimant's case.

the burden then shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform that are consistent with his RFC, age, education, and past work experience. 20 C.F.R. § 404.1512(f); 20 C.F.R. § 416.912(f).

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Mr. Snyder is disabled, but whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was

reached based upon a correct application of the relevant law.  *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## III.   THE ALJ'S DECISION

In her April 2014 decision denying Mr. Snyder's applications for benefits, the ALJ found that Mr. Snyder last met the insured status requirement of Title II of the Social Security Act through June 30, 2012.  Thus, to prevail on his Title II claim Mr. Snyder must show that he became disabled on or before June 30, 2012.  This requirement, however, does not apply to Mr. Snyder's Title XVI claim, which was considered through the date of the ALJ's written decision.

The ALJ evaluated Mr. Snyder's claims at each step of the five-step sequential evaluation process.

At step one, the ALJ found that Mr. Snyder did not engage in substantial gainful activity between June 12, 2011, and April 24, 2014.  (Admin. Tr. 15; Doc. 9-2 p. 16).

At step two, the ALJ found that the medical evidence of record established the presence of the following medically determinable severe impairments during the relevant period:

degenerative disc disease, migraines, obesity, mood disorder, and anxiety disorders.[2] *Id.*  The ALJ found that the following impairments were medically determinable but non-severe: hypertension, and recurrent hernia.  The ALJ found that Mr. Snyder's hypertension did not result in any work-related limitations, and that Mr. Snyder's hernia's had not resulted in work-related limitations for a period of twelve continuous months or more. (Admin. Tr. 15-16; Doc. 9-2 pp. 16-17).

At step three the ALJ found that Mr. Snyder did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the impairments listed in the version of 20 C.F.R. Part 404, Subpart P, Appendix 1 that was in effect on the date the ALJ issued her decision.  (Admin. Tr. 16-17; Doc. 9-2 pp. 17-18)

Between steps three and four of the sequential evaluation process, the ALJ evaluated Mr. Snyder's RFC.  In doing so she considered and weighed medical opinions by the following sources: nontreating physician Amatul B. Khalid ("Dr. Khalid"); nonexamining physician Dilip S. Kar ("Dr. Kar"); nonexamining psychologist Louis Poloni ("Dr. Poloni"); and, nonexamining psychologist Arlene Rattan ("Dr. Rattan").

On December 15, 2011, Dr. Khalid examined Mr. Snyder.  Mr. Snyder reported significant limitations due to back problems, migraine headaches, and bipolar II disorder. (Admin. Tr. 500-503; Doc. 9-8 pp. 26-30).  Mr. Snyder disclosed that he had been having back

---

[2] The parties do not dispute that Mr. Snyder had a body mass index consistent with obesity throughout the relevant period.  In December 2011, Mr. Snyder weighed 393 pounds and had a body mass index ("BMI") of 53.4. (Admin. Tr. 499; Doc. 9-8 p. 26).  In September 2012, Mr. Snyder weighed 428 pounds and had a BMI of 62.0. (Admin. Tr. 513; Doc. 9-8 p. 40).  The BMIs recorded in December 2011 and September 2012 are consistent with Level III, termed "extreme" obesity.  SSR 02-01p, 2002 WL 34686281 at *2.

problems since he was eighteen years old, but has no history of fracture, has never had surgery, has never done physical therapy, and has never seen a specialist. *Id.* Mr. Snyder reported that it is difficult for him to sit for long periods, and can stand for approximately fifteen minutes before he experiences pain in his legs. He reported migraines up to three times weekly that result in the following symptoms: nausea and vomiting, photophobia, and intolerance of noise. *Id.* Mr. Snyder also stated that he had bipolar II disorder, anxiety, and depression. *Id.* Mr. Snyder reported that he had been hospitalized in a psychiatric facility on two occasions for suicidal/homicidal ideations, and currently experiences the following symptoms: feelings of worthlessness, sadness, loneliness, social isolation, inability to tolerate crowds. *Id.* On physical examination, Dr. Khalid noted that Mr. Snyder was morbidly obese, had tenderness in his spine (cervical, lower thoracic, and upper lumbar), had a slightly decreased range of motion in his spine on forward flexion only, and had a positive straight leg raise bilaterally at sixty degrees. *Id.* Dr. Khalid assessed that Mr. Snyder suffered from:

> Chronic back pain, since fall injury. Pain to palpation of cervical spine, lower thoracic and upper lumbar. SLR is positive at 60 degrees with pain in groin and also lower back. He would benefit from follow-up with this. He has trouble laying down on exam table. His range of motion and limitations are somewhat limited due to his body habitus.

(Admin. Tr. 502; Doc. 9-8 p. 29). In an accompanying check-box physical RFC assessment, Dr. Khalid assessed that Mr. Snyder could: occasionally lift or carry up to twenty pounds; frequently carry up to three pounds; stand and walk up to two hours in an eight-hour workday; sit up to twenty minutes in and eight-hour workday; and occasionally bend, kneel, stoop, crouch, balance, or climb. (Admin. Tr. 509-510; Doc. 9-8 pp. 36-37).

On September 10, 2012, Dr. Khalid examined Mr. Diaz for a second time. (Admin. Tr. 513-517; Doc. 9-8 pp. 40-44). During this appointment, Mr. Snyder disclosed that suffered

from back pain, migraines, knee pain, and bipolar II disorder. *Id.* Mr. Snyder reported that he sought medical treatment three days after his accident, had an MRI six years ago that showed bone spurs and bulging discs, and did physical therapy approximately five years ago. *Id.* Mr. Snyder disclosed that he got migraines once per week. *Id.* He reported that he suffers from knee pain, and that eight years ago an MRI revealed that he has "no cartilage left," but does not see a specialist. *Id.* With respect to his mental impairments, Mr. Snyder reported that he follows with a psychologist, and experiences the following symptoms: rapid mood swings and anger outbursts, depression, social isolation/withdrawal, and dislikes leaving his home. *Id.* On physical examination Dr. Khalid noted that Mr. Snyder was morbidly obese, had gained seventy-five pounds since his last examination, had tenderness in his spine (thoracic and lumbar), had crepitus in both knees, had decreased lumbar flexion and decreased knee flexion, and decreased muscle strength (4/5 power) in his upper and lower extremities. *Id.* Mr. Snyder had a positive straight leg raise bilaterally at thirty-five degrees. *Id.* Dr. Khalid assessed:

> Chronic low back pain, possible DDD, s/p fall. He has trouble laying down on exam table. His range of motion and limitations are somewhat limited due to his body habitus. No recent imaging to review. his[sic] radicular symptoms point towards S2 dermatome.

(Admin. Tr. 516-; Doc. 9-8 p. 43). In a check-box physical RFC assessment, Dr. Khalid assessed that Mr. Snyder could: occasionally lift or carry up to one hundred pounds; frequently lift or carry up to ten pounds; stand or walk up to two hours per eight-hour day; sit up to one hour per eight-hour day; and, occasionally bend, kneel, stoop, crouch, balance, or climb. (Admin. Tr. 894-95; Doc. 9-11 pp. 133-134). Dr. Khalid also noted that there were certain tones that Mr. Snyder could not hear. *Id.*

On October 22, 2012, Dr. Kar completed a physical RFC assessment after reviewing Mr. Snyder's medical records. (Admin. Tr. 115-117; Doc. 9-3 pp. 32-34). Dr. Kar assessed that, despite his physical impairments, Mr. Snyder could: occasionally lift and/or carry (including upward pulling) twenty pounds; frequently lift and/or carry (including upward pulling) ten pounds; stand and/or walk (with normal breaks) for a total of two hours; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently reach; occasionally crawl, crouch, kneel, stoop, climb ramps, and climb stairs; never climb ramps or climb stairs; and work in environments where there would be no exposure to hazards (machinery, heights, etc.). *Id.* Dr. Kar reported that these findings apply to Mr. Snyder's current condition on the date of the opinion, as well as to Mr. Snyder's condition as of his date last insured for the purposes of his Title II claim. *Id.*

On December 1, 2011, Dr. Poloni completed a Psychiatric Review Technique ("PRT") assessment and evaluated Mr. Snyder's mental RFC after reviewing Mr. Snyder's medical records.[3] In his PRT assessment Dr. Poloni assessed that Mr. Snyder had medically determinable impairments that did not precisely satisfy the diagnostic criteria of the following mental disorders: affective disorders, and anxiety-related disorders. (Admin. Tr. 88-89; Doc. 9-

---

[3] The PRT is a special technique used to evaluate the severity of mental impairments, and is described in 20 C.F.R. §416.920a. During this assessment the ALJ rates the degree of a claimant's functional limitation in the following areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. §416.920a(effective Jan. 13, 2011 to Jan. 16, 2017). The degree of limitation in the first three categories is rated on the following scale: none, mild, moderate, marked, and extreme. *Id.* The degree of limitation in the last category is rated on the following scale: none, one or two, three, four or more. *Id.* These criteria were amended in January 2017.

3 pp. 6-7).  He assessed that these disorders resulted in: a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  *Id.*  Dr. Poloni assessed that Mr. Snyder had no sustained concentration and persistence limitation, but did have some history of difficulty managing conflicts effectively. (Admin. Tr. 92-93; Doc. 9-3 pp. 9-10).  Dr. Poloni also reported, however, that despite his social limitation, Mr. Snyder would be able to function adequately in a social context.  *Id.*

On August 31, 2012, Dr. Rattan completed a PRT assessment and evaluated Mr. Snyder's mental RFC after reviewing Mr. Snyder's medical records.  In her PRT assessment Dr. Rattan assessed that Mr. Snyder had medically determinable impairments that did not precisely satisfy the diagnostic criteria of the following mental disorders: affective disorder, anxiety disorder, and personality disorder.  (Admin. Tr. 113-114; Doc. 9-3 pp. 30-31).  She assessed that these disorders resulted in: a mild restriction of activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and no repeated episodes of decompensation of extended duration.  *Id.*  Dr. Rattan reported that this assessment accurately represented Mr. Snyder's current condition, and his condition as of his date last insured for the purposes of his Title II claim.  *Id.*  In her mental RFC assessment, Dr. Rattan assessed that Mr. Snyder could do the following despite the limitations resulting from his mental disorders: make simple decisions and carry out short, simple instructions; maintain socially appropriate behavior; and perform personal care functions needed to maintain an acceptable level of personal hygiene.  (Admin. Tr. 117-119; Doc. 9-3 pp. 34-36).  She concluded that Mr. Snyder could meet the basic mental demands of

competitive work on a sustained basis despite the limitations resulting from his mental impairments. *Id.*

Based on her consideration of the above medical opinions, and of the other relevant evidence of record, the ALJ found that, during the relevant period, Mr. Snyder had the RFC to engage in light work, as defined in 20 C.F.R. §404.1567(b) and 20 C.F.R. §416.967(b) except that:

> he should avoid climbing stairs, ramps, ropes, ladders, scaffolds and poles, he can occasionally stoop, and should avoid kneeling, crouching, squatting, or crawling. He should avoid concentrated exposure to extreme cold and heat, fumes, dusts, gases, poor ventilation, and direct sunlight. He should avoid working in loud or very loud settings, and should avoid working around large vibrating objects or surfaces, around or with hazardous machinery, high exposed places, large fast moving machinery on the ground, around or with sharp objects, and around or with toxic chemicals. He should avoid direct contact with the public and should only interact with coworkers occasionally.

(Admin. Tr. 17; Doc. 9-2 p. 18).

At step four the ALJ found that Mr. Snyder was unable to perform any of his past relevant work. (Admin. Tr. 19; Doc. 9-2 p. 20). The ALJ's findings are consistent with VE Earhart's testimony that, based on the ALJ's assessment of Mr. Snyder's current RFC, Mr. Snyder could not engage in any of his past relevant work. (Admin. Tr. 71; Doc. 9-2 p. 72).

At step five, the ALJ evaluated whether, considering the above RFC, and Mrs. Snyder's age (younger individual), education (high school), and work experience, Mr. Snyder could engage in any other work that exists in the national economy. The ALJ based her assessment on testimony by VE Earhart. In response to a hypothetical question posed by the ALJ VE Erickson identified the following occupations that Mr. Snyder could perform despite his limitations: shirt presser (DOT#363.685-026), assembler of plastic hospital equipment (DOT #712.687-010), and gate guard (DOT #372.667-030). (Admin. Tr. 72; Doc. 9-2 p. 73). The

- 12 -

ALJ concluded that Mr. Snyder was not disabled because he could engage in other work that exists in the national economy despite the limiting effects of his impairments. (Admin. Tr. 20-21; Doc. 9-2 pp. 21-22).

## IV.   ANALYSIS

Mr. Snyder alleges that the ALJ's decision denying his applications for benefits is not supported by substantial evidence based on the following errors: (A) the ALJ's assessment that Mr. Snyder could stand and walk for a total of six hours per eight-hour workday is not supported by substantial evidence (Doc. 13 pp. 20-25, 28-32); (B) the ALJ erred when she concluded that Mr. Snyder's recurrent hernia and surgical complications was not a severe impairment (Doc. 13 pp. 14-16); and (C) the ALJ failed to account for the full extent of his difficulties maintaining social functioning and maintaining concentration, persistence or pace at step three and in her RFC assessment (Doc. 13 pp. 17-20, 26-28), (Doc. 16 pp. 1-6).

The Court finds that the latter two arguments lack merit, and have addressed them below.  The first argument, however, has considerable merit and warrants remand in this case.

### A.   WHETHER THE ALJ'S RFC ASSESSMENT OF MR. SNYDER'S ABILITY TO STAND AND WALK IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Mr. Snyder argues that the ALJ's RFC assessment of Mr. Snyder's physical limitations, and by extension the ALJ's ultimate conclusion on the issue of disability, is not supported by substantial evidence because the ALJ failed to account for the full extent of Mr. Snyder's back impairment when considered in combination with his obesity.  For the reasons articulated herein, the Court finds that the ALJ's assessment that Mr. Snyder could stand and walk for a total of six hours per eight-hour workday is not supported by substantial evidence.

### 1. Social Security Rulings 83-10 and 02-1p

SSR 83-10 clarifies the manner in which the medical-vocational rules in 20 C.F.R. Part 404, Subpart P, Appendix 2 should be used to determine a claimant's capacity to do other work at step five of the sequential evaluation process. *1983 WL 31251*. This ruling also includes a glossary defining terms and concepts that are used when a claimant's capability to do other work under the medical-vocational rules. *Id.* at *4. Mr. Snyder relies on the following language from this glossary:

> The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, *the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday*. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

*Id.* at *5(emphasis added).

SSR 02-01p provides guidance on the application of Social Security policy to claims where obesity is a medically determinable severe impairment. This ruling provides that:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking,

lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

SSR 02-1p, 2002 WL 34686281 at *6.

### 2. Whether the ALJ's Assessment that Mr. Snyder can stand or walk six hours per eight-hour day is supported by substantial evidence

In this case, both the nontreating and nonexamining medical sources agree that Mr. Snyder cannot stand or walk for a combined total of six hours per eight-hour workday. The ALJ, however, found that Mr. Snyder could engage in light work, which, pursuant to SSR 83-10 requires standing and walking on and off for approximately six hours per eight-hour day.

The record in this case includes very little objective evidence that pertains to the limiting effects of Mr. Snyder's medically determinable back impairment. On May 8, 2008, x-rays of Mr. Snyder's knees were normal. (Admin. Tr. 654-655; Doc. 9-10 pp. 29-30). On December 15, 2011, Dr. Khalid noted that Mr. Snyder walked with a normal gait, but had tenderness in his spine. (Admin. Tr. 501; Admin. Tr. 9-8 p. 28). On December 23, 2011, and x-ray of Mr. Snyder's lumbar spine was normal. (Admin. Tr. 776; Doc. 9-11 p. 15). On September 10, 2012, an x-ray of Mr. Snyder's lumbar spine was normal, (Admin. Tr. 945; Doc. 9-12 p. 36), and Dr. Khalid noted that Mr. Snyder walked with a normal gait but had tenderness in his spine, (Admin. Tr. 515; Doc. 9-8 p. 42). On September 17, 2012, an x-ray of Mr. Snyder's thoracic spine noted mild degenerative changes in the lower thoracic spine. (Admin. Tr. 1069; Doc. 9-13 pp. 39). On September 19, 2012, Mr. Snyder was prescribed a portable tens unit for his back. (Admin. Tr. 963; Doc. 9-12 p. 54). Mr. Snyder refused to get any treatment at a pain management clinic. (Admin. Tr. 1061; Doc. 9-13 p. 31). In October 2012 a neurologist

- 15 -

assessed that he had no further suggestions except that Mr. Snyder needed to lose a lot of weight to help his back pain. *Id.*

The Commissioner argues that the ALJ was not required in this case to seek a separate medical opinion to support her assessment that Mr. Snyder could stand or walk for up to six hours per eight-hour workday. (Doc. 15 p. 23). The Commissioner relies on *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011), a case where the Third Circuit upheld an ALJ's decision where the ALJ assessed an RFC assessment that was more restrictive than was supported by a nonexamining medical source opinion issued at the early stages of the administrative review process. This case, however, is distinguishable from *Chandler* on its facts. In this case, there are multiple medical opinions that agree that Mr. Snyder could not stand or walk for a total of six hours per eight-hour day. The ALJ imposed *fewer* restrictions than either medical opinion of record. The objective medical evidence of record does not contain any evidence from which is clearly inconsistent with the medical opinions of record. Furthermore, SSR 02-1p is clear that, the combined effect of Mr. Snyder's obesity and his back impairment may result in a greater degree of limitation than could be expected if Mr. Snyder suffered from a back impairment alone. 2002 WL 346826281 at *6. As such, because all medical sources of record are in agreement that Mr. Snyder cannot stand for six hours, and because there is not otherwise substantial objective evidence of record to support the ALJ's assessment, the Court finds that the ALJ's conclusion that Mr. Snyder could stand for six hours per eight-hour workday is supported by substantial evidence. The Court also finds that, given the lack of evidence that is inconsistent with the opinions of Dr. Khalid and Dr. Kar, the ALJ erred by discounting these opinions. As such, the Court is compelled to remand this case for further review. On remand, the Commissioner shall commit this matter to an ALJ to conduct a new

administrative hearing for further evaluation of the extent to which Mr. Snyder's obesity, considered in in combination with his back impairment, results in a limitation to his ability to stand and walk for long periods of time.

B.  WHETHER THE ALJ ERRED AT STEP TWO OF THE SEQUENTIAL EVALUATION PROCESS

Mr. Snyder argues that the ALJ erred when she found that Mr. Snyder's medically determinable umbilical hernia was non-severe.  Mr. Snyder argues that the ALJ should have considered Mr. Snyder's hernia, and its recurrence, severe because his medically determinable severe impairment of obesity places him at greater risk of recurrence.

The record reflects that on March 13, 2013, Mr. Snyder was examined with complaints of severe abdominal pain.  (Admin. Tr. 527-528; Doc. 9-9 pp. 8-9).  On examination he reported that he noticed a knot around his navel one week ago that, over the course of that week, increased from the size of a pencil eraser to the size of the tip of his thumb.  *Id.*  Mr. Snyder was diagnosed with an umbilical hernia and was instructed to avoid lifting more than ten pounds and straining "for now." *Id.*

On March 26, 2012, Mr. Snyder was examined by a surgeon for evaluation of a suspected umbilical hernia.  (Admin. Tr. 736-737; Doc. 9-10 pp. 111-112).  Mr. Snyder reported that he was working on his parents' car a couple of weeks ago and felt a pain in his abdomen and some swelling at his belly button.  *Id.*  Mr. Snyder was diagnosed with an umbilical hernia. *Id.*

On April 2, 2012, Mr. Snyder had his umbilical hernia surgically repaired.  (Admin. Tr. 787; Doc. 9-11 p. 26).  No complications were noted on the operative report.  *Id.*

- 17 -

On April 8, 2012, Mr. Snyder presented to the emergency room at the Fulton County Medical Center with complaints of abdominal pain, redness, and swelling that began after he bent over to pick up a bag.  (Admin. Tr. 790; Doc. 9-11 p. 29).  Diagnostic imaging of Mr. Snyder's chest and abdomen were unremarkable.  (Admin. Tr. 790; Doc. 9-11 p. 28).  Mr. Snyder was diagnosed with post-surgical umbilical pain, and was discharged with instructions to stay on a clear liquid diet, and to come in the next day for an appointment with his surgeon. (Admin. Tr. 794, 798; Doc. 9-11 p. 32, 37).

Post-operative notes dated April 9, 2012, reflect that Mr. Snyder reported that he was bending over the day before and felt something rip in his stomach, then he began experiencing bad pain around his umbilicus.  (Admin. Tr. 723; Doc. 9-10 p. 98).  Mr. Snyder was diagnosed with a recurrence of his hernia, and further surgery was recommended.  *Id.*

On April 16, 2012, Mr. Snyder had a second surgery.  (Admin. Tr. 804; Doc. 9-11 p. 43). Mr. Snyder's post-operative diagnosis was seroma/hematoma of the umbilical hernia repair with the umbilicus being torn from the abdominal wall.  *Id.*  The operative report reflects that Mr. Snyder tolerated this procedure well.  *Id.*

On April 26, 2012, Mr. Snyder presented at the Fulton County Medical Center Emergency Department with complaints of abdominal pain.  (Admin. Tr. 806-812; Doc. 9-11 pp. 45-51).  A  CT scan of Mr. Snyder's abdomen and pelvis revealed the impression of increased density in the periumbillical region, which could be due to post-surgical changes in the patient, but an underlying resolving hematoma or abscess could not be ruled out.  (Admin. Tr. 805; Doc. 9-11 p. 44).  Mr. Snyder was diagnosed with a probable abscess in the abdominal wall and discharged with instructions to follow-up.  (Admin. Tr. 811; Doc. 9-11 p. 50).

On April 27, 2012, Mr. Snyder returned to the Fulton County Medical Center Emergency Department because his symptoms were getting worse.  Mr. Snyder was diagnosed with a dehisced umbilical hernia repair, and was discharged.  (Admin. Tr. 826; Doc. 9-11 p. 65).

On April 30, 2012, Mr. Snyder was examined by his surgeon with complaints of drainage and redness around the incision.  (Admin. Tr. 725; Doc. 9-10 p. 100).  He reported that he felt much better after using the antibiotics administered at the emergency room.  *Id.*  The redness around his incision was reduced.  Mr. Snyder was diagnosed with an infected postoperative seroma.  *Id.*

On May 10, 2012, Mr. Snyder was examined at the Fulton County Medical Center Emergency Room with complaints of abdominal pain.  A CT scan of Mr. Snyder's abdomen revealed the impression of a subcutaneous wound, but no evidence to indicate an acute abdominal or pelvic abnormality.  (Admin. Tr. 830; Doc. 9-11 pp. 69).  The emergency room physician reported the impression of abscess draining and pancreatitis, and Mr. Snyder was discharged in stable condition.  (Admin. Tr. 835; Doc. 9-11 p. 74).

On May 14, 2012, Mr. Snyder was examined by his surgeon.  (Admin. Tr. 726; Doc. 9-10 p. 101).  It was noted that Mr. Snyder had clear drainage around the site of the incision, and that he was diagnosed with pancreatitis in the emergency room.  *Id.*  Mr. Snyder was diagnosed with seroma complicating a procedure, pancreatitis, and morbid obesity.  *Id.*  He was instructed to continue cleaning his incision daily, and labs were ordered to determine whether his pancreatic enzymes had returned to normal.  *Id.*  Lab work confirmed that Mr. Snyder's lipase was elevated.  (Admin. Tr. 755; Doc. 9-10 p. 130).

There is no evidence that Mr. Snyder followed up with his surgeon or that he experienced any further complications stemming from his hernia repair.   During his administrative hearing Mr. Snyder reported that his hernia recurred.  (Admin. Tr. 53; Doc. 9-2 p. 54).  There is no objective evidence confirming the diagnosis of a third hernia.

At step two of the sequential evaluation process, the ALJ considers whether a claimant's impairments are (1) medically determinable or non-medically determinable, and (2) severe or non-severe.  *See* 20 C.F.R. §404.1520(a)(4)(ii); 20 C.F.R. §416.920(a)(4)(ii).  There is no dispute that the ALJ found Mr. Snyder's hernia medically determinable.

The Commissioner's regulations provide that "[a]n impairment is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §404.1521(a); 20 C.F.R. §416.921(a); *see also* SSR 85-28, 1985 WL 56856 at *3 ("An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered").

The Third Circuit has observed that "[t]he burden placed on an applicant at step two is not an exacting one."  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). Moreover, any doubt as to whether a claimant has made a sufficient showing of severity at step two should be resolved in favor of the applicant.  *Id.*  Unlike an error in determining whether an impairment is medically determinable, generally a decision is not defective where an ALJ finds that a particular impairment is medically determinable, but subsequently errs by determining that it is non-severe as long some other medical condition was found severe at step two.  *See*

*Shedden v. Astrue*, No. 4:10-CV-2515, 2012 WL 760632 at *9 (M.D.Pa. Mar. 7, 2012)("A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.").   The Social Security regulations contemplate that, in assessing a claimant's  RFC prior to step four, the ALJ considers the symptoms of all medically determinable impairments, whether they are found severe or non-severe at step-two. 20 C.F.R. §404.1545(a)(2); 20 C.F.R. §416.945(a)(2).

The Commissioner's current guidance on Social Security Administration policy concerning the evaluation of obesity in Title II and Title XVI claims provides that obesity increases the risk of developing some impairments, and leads to or complicates others.  SSR 02-1p, 2002 WL 34686281 at *3.   Where obesity is a medically determinable severe impairment, the ALJ should assess the combined effects of obesity with other impairments, and recognizes that the limiting effects of a co-existing impairment may be greater in an obese claimant than is typically observed in a non-obese claimant.  *Id.* at 6.

Based on the legal principles articulated above, the Court finds that Mr. Snyder's step two argument lacks merit.   Based on the evidence in the record, the ALJ's position that Mr. Snyder did not experience limitations resulting from his hernia for a period of twelve months or more is supported by substantial evidence.   Although Mr. Snyder argues that he could experience recurrent hernias as a result of his obesity, the record in this case does not include any objective evidence that Mr. Snyder actually experienced any recurrence outside of the three month period discussed above.

C. WHETHER THE ALJ PROPERLY EVALUATED MR. SNYDER'S MENTAL IMPAIRMENTS

Mr. Snyder raises several allegations of error that pertain to the ALJ's evaluation of the limitations resulting from his medically determinable severe mental impairments of mood disorder and anxiety disorder. Specifically, he asserts that: (1) the ALJ erred by finding that Mr. Snyder did not meet listings 12.04 and 12.06; and, (2) the ALJ failed to apply SSR 85-15 to Mr. Snyder's claim. For the reasons articulated below, the Court finds that these arguments lack merit.

**1. Whether the ALJ Properly Evaluated Mr. Snyder's Claims under Listing 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1.**

At step three of the sequential evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments that are acknowledged to be so severe as to preclude substantial gainful activity. 20 C.F.R. §404.1520(a)(4)(iii); 20 C.F.R. §416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; *Burnett*, 220 F.3d at 119.

The ALJ in this case found that the severity of Mr. Snyder's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 or 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1. The version of listings 12.04 and 12.06 in effect on the date the ALJ issued her decision required a claimant to meet criteria under either paragraph A and B, or paragraph A and C of the listing to be awarded benefits at step three. 20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00A (effective Feb. 26, 2014 to Dec. 8, 2014). The ALJ found that Mr. Snyder did not meet paragraphs B or C of listing 12.04 or 12.06 and therefore could not meet either listing. Mr. Snyder contends that the ALJ erred when she concluded that Mr. Snyder did not meet paragraph B. The paragraph B criteria of the

version of listings 12.04 and 12.06 in effect on the date the ALJ issued her decision were identical. 20 C.F.R. Part 404, Subpart P, Appendix 1 §§12.04, 12.06 (effective Feb. 26, 2014 to Dec. 8, 2014).

To meet paragraph B of listings12.04 or12.06 the claimant must demonstrate at least two of the following: marked restriction of activities of daily living; marked difficulty maintaining social functioning; marked difficulties maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. *Id.* The ALJ concluded that Mr. Snyder did not meet any of the paragraph B criteria. Mr. Snyder contends that he has marked difficulty maintaining social functioning, and marked difficulty maintaining concentration, persistence, or pace.

Under the standard of review articulated above, the Court must affirm the ALJ's decision at step three if it is supported by substantial evidence. The Court will begin its assessment by examining whether the ALJ's determination that Mr. Snyder has "moderate" difficulty maintaining social functioning is supported by substantial evidence.

Pursuant to the version of 20 C.F.R. Part 404, Subpart P Appendix 1 effective on the date the ALJ issued her decision, social functioning refers to:

> [the claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. [The claimant] may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. [The claimant] may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C2 (effective Feb. 26, 2014 to Dec. 8, 2014).

The ALJ provided the following analysis in explanation of her decision that Mr. Snyder had moderate difficulty maintaining social functioning:

> He [Mr. Snyder] alleges he can not[sic] stand being around other people and that he gets severe anxiety when out in public.  He alleged he has been fired from jobs due to making threats at supervisors.  He alleges he can be fine one minute and then fly off the handle the next minute (Exhibits 4E, 7F, and testimony).

(Admin. Tr. 16; Doc. 9-2 p. 17).  The ALJ also accorded "great" weight to the opinions by Dr. Poloni and Dr. Rattan, who both opined that Mr. Snyder had moderate limitations in social functioning.  Citing to essentially the same evidence summarized by the ALJ, Mr. Snyder argues that his difficulty maintaining social functioning is marked, rather than moderate.  Mr. Snyder essentially argues that remand is warranted because, looking at the same evidence, he believes a different conclusion should be reached in this case.  However, the Court finds that either position could be reasonably supported by the evidence.  Further, if it is possible that an adjudicator could reasonably draw two inconsistent positions from the same evidence, and the ALJ took one of those positions, then the ALJ's decision should be affirmed.

Pursuant to the version of 20 C.F.R. Part 404, Subpart P Appendix 1 effective on the date the ALJ issued her decision, concentration, persistence or pace refers to:

> the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical

- 24 -

examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

20 C.F.R. Part 404, Subpart P, Appendix 1 §12.00C2 (effective Feb. 26, 2014 to Dec. 8, 2014).

As with social functioning, a "marked" limitation in concentration persistence or pace is not defined by a specific number of tasks that the claimant is unable to complete, but by the nature and overall degree of interference with function. *Id.* For example, a claimant who is unable to sustain attention and persist in complex tasks, but is able sustain attention and persist in simple tasks does not have a marked limitation. *Id.* The ALJ provided the following analysis in explanation of her decision that Mr. Snyder had moderate difficulty maintaining concentration, persistence, or pace:

He alleges he has a hard time staying focused, completing tasks, concentrating, and understanding and following instructions. He alleges he can not handle stress, or change in his routine. (Exhibit 4E).

(Admin. Tr. 16; Doc. 9-2 p. 17). The ALJ also accorded "great" weight to the opinions by Dr. Poloni and Dr. Rattan. Dr. Poloni assessed that Mr. Snyder had mild difficulties maintaining concentration, persistence, or pace, and Dr. Rattan assessed that Mr. Snyder had moderate difficulties maintaining concentration, persistence, or pace. Relying on similar evidence that

reflects the same subjective statements cited by the ALJ, Mr. Snyder argues that the ALJ should have found a "marked" rather than moderate limitation. The Court finds that the ALJ's position could be reasonably supported by the evidence, and therefore is not a basis for remand.

### 2. Whether the ALJ Failed to Follow SSR 85-15

Social Security Ruling 85-15 clarifies how the decisional rules in 20 C.F.R. Part 404, Subpart P, Appendix 2 may be used as a framework to evaluate claims where the claimant has no medically determinable impairment that limits physical exertion. Specifically, Mr. Snyder relies on the following language:

> *Where a person's only impairment is mental,* is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

1985 WL 56857 at *4 (*emphasis added*). Mr. Snyder argues that the ALJ did not "explore the relevant mental demands as required by SSR 85-15." (Doc. 13 p. 28). The Court finds that this argument lacks merit.

First, SSR 85-15 discusses cases involving solely nonexertional limitations. In this case the ALJ found, and Mr. Snyder appears to agree, that he suffers from a combination of exertional and nonexertional impairments. The use of the medical vocational rules as a framework for evaluating a combination of exertional and nonexertional impairments is discussed in SSR 83-14. 1983 WL 31254. As such, the Court finds that the ALJ did not err by failing to apply SSR 85-15 in this case.

Second, as a more general matter, the Court finds that Mr. Snyder's contention that the ALJ did not explore Mr. Snyder's relevant mental limitations lacks merit.   The mental limitations at issue are the same ones cited in Mr. Snyder's argument at step three.   He alleges that he is unable to respond appropriately to coworkers, or be around "a lot of people."   (Doc. 13 p. 27).   In her RFC assessment the ALJ found that Mr. Snyder should avoid direct contact with the public and should only interact with coworkers occasionally.   In this context, the term "occasional" means that Mr. Snyder would have direct contact no more than one-third (approximately two hours) of each workday.   *See e.g.* U.S. Department of Labor, *Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles* C-3 (1993) *available on Westlaw at* SCODICOT Appendix C.   Moreover, two of the jobs identified by VE Earhart require no more than "taking instructions-helping," while the third is limited to "speaking-signaling."[4]   *See* DICOT 363.685-026, 1991 WL 673023 (4th ed. Rev. 1991)(defining Shirt Presser); DICOT 712.687-010, 1991 WL 679245 (4th ed. Rev. 1991)(defining assembler, plastic hospital products); DICOT 372.667-030, 1991 WL 673099 (4th ed. Rev. 1991)(defining gate guard).   The Court fails to see how the limitations articulated by the ALJ in her RFC

---

[4] The Dictionary of Occupational Titles recognizes that ever job requires a worker to function, in some degree, in relation to Data, People, and Things.   A worker's relationship with "people" refers to the way a worker would be required to interact with human beings or animals.   The terms "taking instructions-helping" and "speaking-signaling" refer to the relationship with People that would be required by a worker in the jobs identified by VE Earhart.   Taking instructions-helping is defined as "attending to the work assignment or orders of a supervisor (no immediate response required unless clarification of instructions or orders is needed.)."   U.S. Department of Labor, *Dictionary of Occupational Titles Vol. 2,* 1006 (4th ed. Rev. 1991) *available on Westlaw* at 1991 WL 688701.   Speaking-signaling is defined as "[t]alking with and/or signaling people to convey or exchange information.   Includes giving assignments and/or directions to helpers or assistants."   *Id.*

assessment fail to account for Mr. Snyder's social limitations.  Further, there is little evidence to suggest that Mr. Snyder would be unable to interact with people in manner required by each of these positions as it is represented in the Dictionary of Occupational Titles or by VE Erickson.

**V.    CONCLUSION**

Based on the foregoing, the Commissioner's decision shall be **VACATED**, and this case shall be **REMANDED** pursuant to sentence four of 42 U.S.C. §405(g).

An appropriate order shall issue.

Dated: **March 10, 2017**                    *s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**